# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**Christy Hunter** and **Feon Smith-Branch**,
*Individually and on behalf of all others*
*similarly situated*,

      Plaintiffs,

      v.

**Fifth Third Bank, National Association,**

      Defendant.

**Case No:** 1:23-cv-00644

**JURY TRIAL REQUESTED**

## CLASS ACTION COMPLAINT

Plaintiffs Christy Hunter and Feon Smith-Branch ("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this Class Action Complaint against Defendant Fifth Third Bank, National Association ("Defendant"), and allege as follows:

1.    Plaintiffs bring this action on behalf of themselves and two classes of similarly situated individuals ("Classes") against Defendant over the improper assessment and collection of overdraft fees ("OD Fees") on debit card transactions authorized on sufficient funds and violation of Regulation E of the Electronic Fund Transfer Act, 12 C.F.R. § 1005.17.

2.    Besides being deceptive, based upon information and belief, this practice breaches Defendant's standardized adhesion Contract.

3.    The practice also breaches Defendant's duty of good faith and fair dealing, unjustly enriches Defendant to the detriment of its customers, and violates OH Rev. Code § 1301.304.

4.    Plaintiffs allege that because Defendant provided inaccurate and untruthful overdraft information to Plaintiffs and the Classes regarding the overdraft practice, under Regulation E of the Electronic Funds Transfer Act, 12 C.F.R. § 1005, Defendant was not authorized

1

to assess OD Fees to consumers for debit card and non-recurring debit card charges. However, Defendant did charge its customers overdraft fees for ATM and debit card charges.

5.     Through the imposition of these fees, Defendant made substantial revenue to the tune of millions of dollars, seeking to turn its customers' financial struggles into revenue. Unfortunately, Plaintiffs, like thousands of others, have fallen victim to Defendant's fee revenue maximization schemes.

<strong>PARTIES</strong>

6.     Plaintiff Christy Hunter is a Georgia citizen and has maintained a checking account with Defendant at all times relevant hereto.

7.     Plaintiff Feon Smith-Branch is a West Virginia citizen and has maintained a checking account with Defendant at all times relevant hereto.

8.     Defendant Fifth Third Bank, National Association, is a foreign corporation registered to do business in Ohio.  Its registered agent is Corporation Services Company, 3366 Riverside Drive, Suite 103, Upper Arlington, Ohio 43221.  Its principal place of business is 38 Fountain Square Plaza, Cincinnati, Ohio 45263.

<strong>JURISDICTION AND VENUE</strong>

9.     This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

10.     Jurisdiction is also proper pursuant to the Class Action Fairness Act 28 U.S.C. § 1332(d) because: 1) the claims of the proposed Classes, when aggregated together, exceed $5,000,000, and 2) some putative members of the Classes are residents of different states than Defendant.

11.     Venue is proper in this district pursuant to 28 U.S.C. § 139(b)(1) because Defendant

is a resident of and does business in this District, and a substantial part of the events and/or omissions giving rise to the claims asserted herein.

## BACKGROUND FACTS

11.     Overdraft fees and insufficient funds fees ("NSF fees") are among the primary fee generators for banks. According to a banking industry market research company, Moebs Services, in 2018 alone, banks generated an estimated $34.5 billion from overdraft fees. *Overdraft Revenue Inches Up in 2018*, https://bit.ly/3cbHNKV.

12.     Unfortunately, the customers who are assessed these fees are the most vulnerable customers. Younger, lower-income, and non-white account holders are among those who were more likely to be assessed OD Fees. *Overdrawn: Consumer Experiences with Overdraft, Pew Charitable Trusts* 8 (June 2014), https://bit.ly/3ksKD0I.

13.     Because of this, industry leaders like Bank of America, Capital One, Wells Fargo, Alliant, and Ally have made plans to end the assessment of OD or NSF fees entirely. *See* Hugh Son, *Capital One to Drop Overdraft Fees for All Retail Banking Customers*, NBC News (Dec. 1, 2021), https://nbcnews.to/3DKSu2R; Paul R. La Monica, *Wells Fargo Ends Bounced Check Fees*, CNN (Jan. 12, 2022), https://bit.ly/3iTAN9k.

14.     In line with this industry trend, the New York Attorney General recently asked other industry-leading banks to end the assessment of all OD Fees by the summer of 2022. *NY Attorney General asks banks to end overdraft fees*, Elizabeth Dilts Marshall, Reuters (April 6, 2022).

15.     Through the imposition of these fees, Defendant has made substantial revenue to the tune of tens of millions of dollars, seeking to turn its customers' financial struggles into revenue.

## I.     DEFENDANT ASSESSES OVERDRAFT FEES ON DEBIT CARD TRANSACTIONS THAT WERE AUTHORIZED ON SUFFICIENT FUNDS

### A. The Contract

16. At all times material hereto, Plaintiffs maintained checking accounts governed by the Contract.

17. The Contract is a standardized form of contracts for deposit accounts, the material terms of which are drafted by Defendant, amended by Defendant from time to time at its convenience and complete discretion, and imposed by Defendant on all deposit account customers.

### B. Overview of the Claim

18. Plaintiffs bring this action challenging Defendant's practice of charging OD Fees on what is referred to in this Complaint as "Authorize Positive, Settle Negative Transactions," or "APSN Transactions."

19. Here is how the practice works. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Defendant immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in the checking account to cover that transaction, and adjusts the consumer's displayed "available balance" to reflect that subtracted amount. As a result, customers' accounts will always have sufficient funds available to cover these transactions because Defendant has already held the funds for payment.

20. However, Defendant still assesses crippling $25 OD Fees on many of these transactions and misrepresents its practices in the Contract.

21. Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, Defendant later assesses OD Fees on those same transactions when they settle days later into a negative balance. These types of transactions are APSN Transactions.

22.     Defendant maintains a running account balance, tracking funds consumers have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, Defendant holds the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the account holder and are specifically reserved for a given debit card transaction.

23.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498 (Jan. 29, 2009).

24.     That means when any subsequent, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for pending debit card transactions. Therefore, many subsequent transactions incur OD fees due to the unavailability of the funds held for earlier debit card transactions.

25.     Still, despite always reserving sufficient available funds to cover the transactions and keeping the held funds off-limits for other transactions, Defendant improperly charges OD Fees on APSN Transactions.

26.     The Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> [A] financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They, therefore, could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.
>
> At one or more institutions, examiners found deceptive practices relating to disclosing overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, "Supervisory Highlights" (Winter 2015).

27.     There is no justification for these practices, other than to maximize Defendant's OD Fee revenue. APSN Transactions only exist because intervening transactions supposedly reduce an account balance. However, Defendant is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year.

28. Nevertheless, Defendant was not content with these millions in OD Fees. Instead, it sought millions more in OD Fees on APSN Transactions.

29. Besides being deceptive, upon information and belief these practices breach contract promises made in Defendant's adhesion contracts, which fundamentally misconstrue and mislead consumers about the true nature of Defendant's processes and practices. Defendant also exploits its contractual discretion by implementing these practices to gouge its customers.

### C. Mechanics of a Debit Card Transaction

30. A debit card transaction occurs in two parts. First, the merchant instantaneously obtains authorization for the purchase amount from Defendant. When a customer physically or virtually "swipes" their debit card, the credit card terminal connects, via an intermediary, to Defendant, which verifies that the customer's account is valid and that sufficient available funds exist to cover the transaction amount.

31. At this step, if the transaction is approved, Defendant immediately decrements the funds in a consumer's account and holds funds in the transaction amount but does not yet transfer the funds to the merchant.

32. Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

33. Defendant (like all banks and credit unions) decides whether to "pay" debit card transactions at authorization. For debit card transactions, that moment of decision can only occur at the point of sale, when the transaction is authorized or declined. It is at that point—and only that point—that Defendant may choose to either pay the transaction or decline it. When the time comes to actually transfer funds for the transaction to the merchant, it is too late for the bank to deny payment—the bank has no discretion and must pay the charge. This "must pay" rule applies

industry-wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. See Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

34. There is no change—no impact whatsoever—to the available funds in an account when the transfer step occurs.

### D. Defendant's Contract

35. Plaintiffs had checking accounts with Defendant at all times material hereto governed by the Contract.

36. Upon information and belief, Defendant promises in the Contract that an overdraft occurs when a customer does not have enough money in his or her account to cover a transaction, but it pays it anyway.

37. In breach of this promise, Defendant assesses OD Fees on debit card transactions when there is enough money in the account to cover a transaction.

38. For APSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there is always enough money to cover the transaction—yet Defendant assesses OD Fees on them anyway.

39. Upon information and belief, the promises in Defendant's Contract indicate that transactions are only overdraft transactions when there is not enough money to cover the transaction at the time the customer swipes his or her debit card to pay for an item. But, of course, that is not true for APSN Transactions.

40. In fact, Defendant actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to post those same transactions. Instead, it uses a secret posting process described below.

41. The above representations and contractual promises are untrue. Defendant charges fees even when sufficient funds exist to cover transactions that are authorized into a positive balance. Upon information and belief, no express language in any document states that Defendant may impose fees on any APSN Transactions.

42. First and most fundamentally, Defendant charges OD Fees on debit card transactions for which sufficient funds are available to cover throughout their lifecycle.

43. Defendant's practice of charging OD Fees even when sufficient available funds exist to cover a transaction violates its contractual promise not to do so. This discrepancy between Defendant's actual practice and the Contract causes consumers like Plaintiffs to incur more OD Fees than they should.

44. Next, sufficient funds for APSN Transactions are immediately debited from the account, consistent with standard industry practice.

45. Because these withdrawals take place upon initiation, the funds cannot be re-debited later. However, that is what Defendant does when it re-debits the account during a secret batch posting process.

46. Defendant's actual practice is to assay the same debit card transaction twice to determine if it overdraws an account—both at the time of a transaction of authorization and later at the time of settlement.

47. At the time of settlement, however, an available balance does not change at all for these transactions previously authorized into positive funds. As such, Defendant cannot then charge an OD Fee on that transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

48. Upon information and belief, something more is going on: at the moment a debit

card transaction is getting ready to settle, Defendant releases the hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

49.     This secret step allows Defendant to charge OD Fees on transactions that never should have gotten them—transactions that were authorized into sufficient funds, and for which Defendant specifically set aside money to pay.

50.     In sum, there is a huge gap between Defendant's practices as described in the Contract and Defendant's actual practices.

51.     Banks and credit unions like Defendant that employ this abusive practice require their accountholders to expressly agree to it—something Defendant here never did.

52.     Indeed, recognizing the complexity of the settlement process for APSN Transactions and the fact that a fee in such circumstances is counterintuitive to accountholders, other banks and credit unions require their accountholders to agree to be assessed OD Fees on APSN Transactions.

53.     For example, Fifth Third Bank states:

> For all Fifth Third Checking accounts*, the fee for each overdraft will be $37, per item, regardless of the number of past occurrences. Additionally, we will only charge Overdraft Fees for a maximum of three overdrafts per day. If your consumer deposit account is overdrawn for seven consecutive days, we will charge a $25 Extended Overdraft Fee on the next business day. We may charge you this fee every 7 days, up to a maximum of four times per continuous overdraft occurrence.

*Overdraft Coverage, If Optional Overdraft Coverage Is Used*, WWW.53.COM, https://www.53.com/content/fifth-third/en/personal-banking/bank/overdraft-solutions/overdraft-coverage.html (last visited August 1, 2023).  Upon information and belief, Defendant and its accountholders make no such agreement.

E.     **Reasonable Consumers Understand Debit Card Transactions are Debited Immediately.**

54.     Defendant's assessment of OD Fees on transactions that have not overdrawn an account is inconsistent with immediate withdrawal of funds for debit card transactions. This is because if funds are immediately debited, they cannot be depleted by intervening, subsequent transactions. If funds are immediately debited, they are necessarily applied to the debit card transactions for which they are debited.

55.     Defendant was and is aware that this is precisely how its accountholders reasonably understand debit card transactions work.

56.     Defendant knows that consumers prefer debit cards for these very reasons.

Consumer research shows that consumers prefer debit cards as budgeting devices because they do not allow debt like credit cards as the money comes directly out of the checking account.

57.     Consumer Action, a national nonprofit consumer education, and advocacy organization, advises consumers in determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card, you lose the one or two days of 'float' time that a check usually takes to clear." *What Do I Need To Know About Using A Debit Card?*, ConsumerAction (Jan. 14, 2019), https://bit.ly/3v5YL62.

58.     This understanding is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States has increased by approximately 1.4 million in the last five years. With that increasing ubiquity, consumers have viewed debit cards (along with credit cards) "as a more convenient option than refilling their wallets with cash from an ATM." Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases*, MarketWatch (Mar. 23, 2016), https://on.mktw.net/3kV2zCH.

59. Not only have consumers increasingly substituted debit cards for cash, but they believe that a debit card purchase is the functional equivalent to a cash purchase, with the swipe of a card equating to handing over cash permanently and irreversibly.

60. Accordingly, "[o]ne of the most salient themes [in complaints to the CFPB] . . . is the difficulty avoiding overdrafts even when consumers believed they would. Often, this was related to bank practices that make it difficult for consumers to know balance availability, transaction timing, or whether or not overdraft transactions would be paid or declined." Rebecca Borne et al., *Broken Banking: How OD Fees Harm Consumers and Discourage Responsible Bank Products*, Center for Responsible Lending 8 (May 2016), https://bit.ly/3v7SvL1.

61. In fact, consumers' leading complaints involved extensive confusion over the available balance and the time of posting debits and credits:



Figure 3: Top Overdraft Consumer Complaint Issues, by Percentage of Total Complaints

62. Consumers are particularly confused by financial institutions' fee practices when "based on their actual review of their available balance, often including any 'pending' transactions, [customers] believed funds were available for transactions they made, but they later learned the

transactions had triggered overdraft fees." *Id.* at 9.

63.     Ultimately, unclear and misleading fee representations like those in Defendant's account documents mean that consumers like Plaintiffs "who are carefully trying to avoid overdraft, and often believe they will avoid it . . . end up being hit by fees nonetheless." *Id.*

64.     The Federal Deposit Insurance Corporation ("FDIC") has specifically noted that financial institutions may effectively mitigate this widespread confusion regarding overdraft practices by "ensuring that any transaction authorized against a positive available balance does not incur an overdraft fee, even if the transaction later settles against a negative available balance." *Consumer Compliance Supervisory Highlights*, FDIC 3 (June 2019), https://bit.ly/3t2ybsY.

65.     Despite this recommendation, Defendant continues to assess OD Fees on transactions that are authorized on sufficient funds.

66.     Defendant was aware of the consumer perception that debit card transactions reduce an account balance at a specified time—namely, the time and order the transactions are actually initiated—and upon information and belief, the Contract only supports this perception.

67.     Defendant was also aware of consumers' confusion regarding OD Fees but nevertheless failed to make its members agree to these practices.

> **F.     Plaintiffs Were Assessed OD Fees on Debit Card Transactions Previously Authorized on Sufficient Funds**

68.     On or around December 29, 2022, Plaintiff Christy Hunter was assessed two OD Fees, even though the transactions that purportedly caused these fees had been previously authorized on sufficient funds.

69.     On or around December 14, December 21, December 27, and December 31, 2021, as well as January 3, January 12, January 13, January 14, January 18, February 3, February 4, February 15, and February 28, 2022, Plaintiff Feon Smith-Branch was assessed OD Fees, even

though the transactions that purportedly caused these fees had been previously authorized on sufficient funds.

70.     Because Defendant had previously held the funds to cover these transactions, Plaintiffs' accounts always had sufficient funds to cover these transactions and should not have been assessed these fees.

**II.     DEFENDANT VIOLATED REGULATION E OF THE ELECTRONIC FUND TRANSFER ACT, 12 C.F.R. § 1005.17.**

     **A.     Regulation E Overview**

71.     The federal government has also stepped in to provide additional protections to consumers with respect to abusive overdraft policies. In 2010, the Federal Reserve Board enacted a regulation permitting financial institutions to charge overdraft fees on ATM and one-time debit charges only if the institution first obtained the customer's affirmative consent. 12 C.F.R. § 1005.17 (Regulation E's "Opt-In Rule").

72.     To qualify as affirmative consent, the opt-in notice/agreement must include, but is not limited to the following:

    a.     The customer must be provided the overdraft policy, including the dollar amount of any fees that will be charged for an overdraft;

    b.     The opt-in consent must be obtained separately from other consents and acknowledgments;

    c.     The consent cannot serve any purpose other than opting into the overdraft program;

    d.     The consent cannot be a pre-selected checked box;

    e.     The financial institution may not provide different items for the account depending on whether the customer opted into the overdraft program.

73.     If the financial institution does not obtain proper, affirmative consent from the customer that meets all of the requirements of the Opt-In Rule, then it is not allowed to charge overdraft fees on ATM and one-time debit card transactions.

74.     At all relevant times, Defendant has had an overdraft program in place for assessing overdraft fees on ATM and debit card transactions, which is: (1) contrary to the express terms of its contracts with its members; (2) contrary to how Defendant represents its overdraft program to its members; and (3) contrary to what members expect when assessed overdraft fees.

75.     As alleged herein, Defendant assesses fees when an account is not actually overdrawn.

76.     Upon information and belief, this practice is in breach of Defendant's Contract. Additionally, the practice of charging overdraft fees even when there is sufficient money in the account to cover the transaction is inconsistent with how Defendant describes the circumstances when it assesses overdraft fees in other customer materials.

77.     Further, Defendant has failed to inform customers of the true conditions under which OD Fees will be assessed in both its Contract and other marketing materials, as alleged herein.

**III.     NONE OF THESE FEES WERE ERRORS**

78.     The improper fees charged by Defendant to Plaintiffs' accounts were not errors by Defendant but rather were intentional charges made by Defendant as part of its standard processing of transactions.

79.     Plaintiffs, therefore, had no duty to report the fees as errors because they were not; instead, they were part of the systematic and intentional assessment of fees according to Defendant's standard practices.

80.     Moreover, any such reporting would have been futile as Defendant's own contract

admits that Defendant decided to charge the fees.

### IV. THE IMPOSITION OF THESE IMPROPER FEES BREACHES DEFENDANT'S DUTY OF GOOD FAITH AND FAIR DEALING

81. Parties to a contract are required not only to adhere to the express conditions of the contract but also to act in good faith when they are invested with discretionary power over the other party. This creates an implied duty to act in accordance with account holders' reasonable expectations and means that the bank or credit union is prohibited from exercising its discretion to enrich itself and gouge its customers. Indeed, the bank or credit union has a duty to honor transaction requests in a way that is fair to its customers and is prohibited from exercising its discretion to pile on even greater penalties on its account holders.

82. Here—in the adhesion agreements Defendant foisted on Plaintiffs and its other customers—Defendant has provided itself numerous discretionary powers affecting customers' accounts. However, instead of exercising that discretion in good faith and consistent with consumers' reasonable expectations, Defendant abuses that discretion to take money out of consumers' accounts without their permission and contrary to their reasonable expectations that they will not be charged improper fees.

83. Defendant abuses its discretion in its own favor—and to the prejudice of Plaintiffs and its other customers—when it assesses fees in this manner. By *always* assessing these fees to the prejudice of Plaintiffs and other customers, Defendant breaches their reasonable expectations and, in doing so, violates its duty to act in good faith. This is a breach of Defendant's implied covenant to engage in fair dealing and to act in good faith.

84. It was bad faith and totally outside Plaintiffs' reasonable expectations for Defendant to use its discretion in this way.

85. When Defendant charges improper fees in this way, Defendant uses its discretion

16

to interpret the meaning of key terms in an unreasonable way that violates common sense and reasonable consumers' expectations. Defendant uses its contractual discretion to set the meaning of those terms to choose a meaning that directly causes more fees.

## CLASS ALLEGATIONS

86.     Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of the following classes.

87.     The proposed Classes are defined as:

**The APSN Class:**

> All Defendant checking accountholders who, during the applicable statute of limitations, were checking account holders of Defendant and were assessed an overdraft fee on a debit card transaction that was authorized on sufficient funds and settled on negative funds in the same amount for which the debit card transaction was authorized (the "APSN Class").

**The Regulation E Class:**

> All US residents who have or have had accounts with Defendant who were opted into the overdraft program for ATM and non-recurring debit card transactions through the use of an opt-in agreement which provided inaccurate or misleading information on Defendant's overdraft program in violation of Regulation E, and were assessed overdraft charges resulting from ATM and/or non-recurring debit card transactions since August 15, 2010 (the "Regulation E Class").

88.     Plaintiffs reserve the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

89.     Excluded from the Classes are Defendant, its parents, subsidiaries, affiliates, officers, directors, legal representatives, successors, and assigns; any entity in which has a controlling interest; all customers members who make a timely election to be excluded; governmental entities; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

17

90.     The members of the Classes are so numerous that joinder is impractical. The Classes consist of thousands of members, whose identities are within the exclusive knowledge of Defendant and can be ascertained only by resorting to Defendant's records.

91.     Plaintiffs' claims are typical of the claims of the Classes in that Plaintiffs, like all members of the Classes, were charged improper fees. Plaintiffs, like all members of the Classes, have been damaged by Defendant's misconduct in that they have been assessed unlawful fees. Furthermore, the factual basis of Defendant's misconduct is common to all members of the Classes and represents a common thread of deceptive and unlawful conduct resulting in injury to all members of the Classes. Plaintiffs have suffered the harm alleged and have no interests antagonistic to the interests of any other members of the Classes.

92.     The questions in this action are ones of common or general interest such that there is a well-defined community of interest among the members of the Classes. These questions predominate over questions that may affect only individual class members because Defendant has acted on grounds generally applicable to the Classes.

93.     Among the questions of law and fact common to the Classes include:

a.     Whether Defendant violated its Contract by charging fees OD Fees on APSN Transactions;

b.     Whether Defendant had standardized Opt-In Agreements during the Class period that were provided to its customers;

c.     Whether Defendant's conduct breached the Opt-In Agreement;

d.     Whether Defendant's conduct violated 12 C.F.R. § 1005.17.

e.     Whether Defendant violated the OH Rev Code § 1301.304;

f.     Whether Defendant breached its covenant of good faith and fair dealing

with Plaintiffs and other members of the Classes through its fee policies and practices;

     g.     Whether Defendant was unjustly enriched by its fee assessment practices;

     h.     The proper method or methods by which to measure damages; and

     i.     The declaratory and injunctive relief to which the Classes are entitled.

94.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the members of the Classes will continue to suffer losses, and Defendant's misconduct will proceed without remedy.

95.     Even if Class members could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows for the consideration of claims which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

96.     Plaintiffs are committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions, particularly on behalf of consumers and against financial institutions. Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Classes.

97.     Plaintiffs suffer a substantial risk of repeated injury in the future. Plaintiffs, like all members of the Classes, is at risk of additional improper fees. Plaintiffs and the Classes are entitled

to injunctive and declaratory relief as a result of the conduct complained of herein. Money damages alone could not afford adequate and complete relief, and injunctive relief is necessary to restrain Defendant from continuing to commit its illegal actions.

### CAUSE OF ACTION ONE

**Breach of Contract, Including Breach of the Covenant of Good Faith and Fair Dealing (On Behalf of Plaintiffs and the Classes)**

98.     Plaintiffs reallege and incorporate by reference all the foregoing allegations as if they were fully set forth herein.

99.     Plaintiffs and Defendant have contracted for bank account services, as embodied in the Contract.

100.     All contracts entered by Plaintiffs and the Classes are identical or substantively identical because Defendant's form contracts were used uniformly.

101.     Defendant has breached the express terms of its own agreements as described herein.

102.     Under Ohio law, good faith is an element of every contract between financial institutions and their customers because banks and credit unions are inherently in a superior position to their checking account holders and, from this superior vantage point, they offer customers contracts of adhesion, often with terms not readily discernible to a layperson.

103.     Good faith and fair dealing mean preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

104.     Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of

20

inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain and abuse of the power to specify terms.

105. Defendant abused the discretion it granted to itself when it charged fees on transactions that did not overdraw an account.

106. Defendant also abused the discretion it granted to itself by defining key terms in a manner that is contrary to reasonable account holders' expectations.

107. In these and other ways, Defendant violated its duty of good faith and fair dealing.

108. Defendant willfully engaged in the foregoing conduct for the purpose of (1) gaining unwarranted contractual and legal advantages; and (2) unfairly and unconscionably maximizing fee revenue from Plaintiffs and other members of the Classes.

109. Plaintiffs and members of the Classes have performed all, or substantially all, of the obligations imposed on them under the Contract.

110. Plaintiffs and members of the Classes have sustained damages as a result of Defendant's breaches of contract, including breaches of contract through violations of the covenant of good faith and fair dealing.

111. Plaintiffs and the members of the Classes are entitled to injunctive relief to prevent Defendant from continuing to engage in the foregoing conduct.

## CAUSE OF ACTION TWO
## UNJUST ENRICHMENT
### (On behalf of Plaintiffs and the Classes)

112. Plaintiffs incorporate the preceding paragraphs of this Complaint as if fully set forth herein.

113. Plaintiffs, individually and on behalf of the Classes, assert a common law claim for unjust enrichment. This claim is brought solely in the alternative to Plaintiffs' breach of contract

claims and applies only if the parties' contracts are deemed unconscionable or otherwise unenforceable for any reason. In such circumstances, unjust enrichment will dictate that Defendant disgorge all improperly assessed fees.

114. Defendant has knowingly accepted and retained a benefit in the form of improper fees to the detriment of Plaintiffs and the members of the Classes, who reasonably expect to be compensated for their injury.

115. Defendant has retained this benefit through its fee maximization scheme, and such retention violates fundamental principles of justice, equity, and good conscience.

116. Defendant should not be allowed to profit or enrich itself inequitably and unjustly at the expense of Plaintiffs and the members of the Classes and should be required to make restitution to Plaintiffs and the members of the Classes.

## CAUSE OF ACTION THREE
### Violations of OH Rev Code § 1301.304, *et seq.* *(On Behalf of Plaintiffs and the Class)*

117. Plaintiffs incorporate by reference the preceding paragraphs.

118. Defendant's practice of charging fees on APSN transactions violates OH Rev Code § 1301.304.

119. OH Rev Code § 1301.304 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in the state of Ohio.

120. Defendant is headquartered in Ohio and has 47 banking locations in Ohio. Accordingly, Defendant conducts business, trade, or commerce in Ohio.

121. In the conduct of its business, trade, and commerce, and in furnishing services in Ohio, Defendant's actions were directed at consumers.

122. In the conduct of its business, trade, and commerce, and in furnishing service in Ohio, Defendant engaged in deceptive, unfair, and unlawful trade, acts or practices, in violation of

OH Rev Code § 1301.304, including but not limited to the following:

        a.     Defendant misrepresented material facts pertaining to the sale and/or furnishing of banking services to Plaintiffs and the Classes that it would not charge OD Fees on APSN transactions;

        b.     Defendant omitted, suppressed, and concealed the material fact that it would charge OD Fees on APSN transactions;

123.    Defendant systematically engaged in these deceptive, misleading, and unlawful acts and practices, to the detriment of Plaintiffs and members of the class.

124.    Defendant willfully engaged in such acts and practices and knew that it violated OH Rev Code § 1301.304 or showed reckless disregard for whether it violated OH Rev Code § 1301.304.

125.    As a direct and proximate result of Defendant's deceptive banking practices, Plaintiffs and members of the Classes suffered injury and/or damages, including the payment deceptive fees, as described herein, and the loss of the benefit of their respective bargains with Defendant.

126.    The unfair and deceptive practices by Defendant, as described herein, were immoral, unethical, oppressive, and unscrupulous. These acts cause substantial injury to consumers that these consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or competition.

127.    Further, Defendant's conduct was substantially injurious to Plaintiffs and members of the putative Classes in that they were forced to pay fees they were told they would not incur.

128.    Defendant's actions in engaging in the above-described unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the

rights of the members of the Plaintiffs and putative Class.

129. Had Plaintiffs and members of the putative Classes known they could be charged the above-described deceptive fees, they would have attempted to avoid incurring such fees.

130. As a result of Defendant's violations of OH Rev Code § 1301.304, Plaintiffs and the putative Classes have suffered and will continue to suffer actual damages.

131. Accordingly, Plaintiffs and the members of the putative Classes are entitled to relief under OH Rev Code § 1301.304, including, but not limited to, actual damages, treble damages, statutory damages, injunctive relief, and/or attorneys' fees and costs.

**CAUSE OF ACTION FOUR**
**VIOLATION OF THE ELECTRONIC FUNDS TRANSFER ACT**
**(On behalf of Plaintiffs and the Class)**

132. Plaintiffs incorporate the preceding paragraphs of this Complaint as if fully set forth herein.

133. Because Defendant's misrepresentations and material omissions as to the operation of the overdraft program, any consent that Defendant obtained for members of the Regulation E Class's participation in the program was fraudulently induced.

134. Because the opt-in form was breached and/or consent to participation was fraudulently induced, Defendant failed to comply with 12 C.F.R. § 1005.17, which requires affirmative consent.

135. Because of Defendant's failure to comply with 12 C.F.R. § 1005.7, it is liable for actual and statutory damages, as well as attorney fees and costs of suit pursuant to 15 U.S.C. 1693m.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and of the members of the Classes, respectfully request the Court to enter an Order:

a.      certifying the proposed Classes, appointing Plaintiffs as Class Representatives, and appointing Plaintiffs' counsel as counsel for the Classes;

b.      declaring Defendant's fee policies and practices alleged in this Complaint to be wrongful and unconscionable in light of its contractual promises;

c.      enjoining Defendant from breaching its Contract;

d.      awarding Plaintiffs and the Classes restitution in an amount to be proven at trial;

e.      awarding actual damages in an amount according to proof;

f.      awarding pre-judgment and post-judgment interest at the maximum rate permitted by applicable law;

g.      awarding costs and disbursements assessed by Plaintiffs in connection with this action, including reasonable attorneys' fees and costs pursuant to applicable law; and

h.      awarding such other relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs, by counsel, demand a trial by jury.


Dated: October 5, 2023                    Respectfully submitted,

                                          */s/ Ashlie Case Sletvold*
                                          Ashlie Case Sletvold
                                          **Peiffer Wolf Carr Kane Conway & Wise, LLP**
                                          6370 Som Center Rd., Suite 108
                                          Cleveland, OH 44139
                                          Ph. 216-589-9280
                                          Email: asletvold@peifferwolf.com

                                          Brandon M. Wise*
                                          **Peiffer Wolf Carr Kane Conway & Wise, LLP**
                                          818 Lafayette Ave., Floor 2
                                          St. Louis, MO 63104
                                          Ph: 314-833-4825
                                          Email: bwise@peifferwolf.com

                                          **Johnson Firm**
                                          Christopher D. Jennings*
                                          Tyler B. Ewigleben*
                                          Winston S. Hudson*
                                          610 President Clinton Avenue, Suite 300
                                          Little Rock, Arkansas 72201
                                          Telephone: (501) 372-1300
                                          chris@yourattorney.com
                                          tyler@yourattorney.com
                                          winston@yourattorney.com

                                          **Pro Hac Vice* to be filed

                                          *Attorneys for Plaintiffs*